**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

THE OFFICIAL COMMITTEE OF UNSECURED
CREDITORS OF APEX GLOBAL INFORMATION       No. 08-cv-10590 (Appeal)
SERVICES, INC., and McTEVIA & ASSOCIATES, INC.,
as liquidating Agent of A.P. Liquidating Co. f/k/a       No. 08-cv-10720 (Cross-Appeal)
APEX GLOBAL INFORMATION SERVICES, INC.

      Appellants / Cross-Appellees,  Hon. Denise Page Hood

v.

QWEST COMMUNICATIONS CORPORATION,
a Delaware corporation,

    Appellee/ Cross-Appellant.

_____/

**MEMORANDUM OPINION AND ORDER AFFIRMING JUDGMENT OF**
**BANKRUPTCY COURT**

**I.  INTRODUCTION**

   This matter is before the Court on Appellants', the Official Committee of Unsecured

Creditors and the Liquidating Agent of A.P. Liquidating Co., f/k/a Apex Global Information

Services, Inc. ("AGIS"), appeal pursuant to 28 U.S.C. § 158(a)(1) from the Judgment of the

United States Bankruptcy Court for the Eastern District of Michigan, Southern Division ("the

Bankruptcy Court"), dismissing the previous bankruptcy proceeding on January 31, 2008.  In

support the Appellants/Cross-Appelee's ("AGIS") filed an Appeal of the Bankruptcy Court's

January 31, 2008 Judgment **[Docket No. 6, filed May 6, 2008]**.  On June 11, 2008, the

Appellee/Cross-Appellant ("Qwest") filed a Combined Brief on Appeal of Appellee/Cross-

Appellant **[Docket No. 11]**, to which the Appellants/Cross-Appellees A.P. Liquidating filed a Reply **[Docket No. 16, filed July 16, 2008]**.  On August 8, 2008, the Apellee/Cross-Appellant Qwest Communication filed a Reply **[Docket No. 20]**.

This instant order also considers the cross-appeal of Appellee, Qwest Communications Corporation, under 28 U.S.C. § 158(a) from the same proceeding entered by the United States Bankruptcy Court for the Eastern District of Michigan in its January 30, 2008 Order dismissing the abovementioned adversary proceeding.  This cross-appeal is the subject of the companion matter styled, *A.P. Liquidating v. Qwest Communications Corp.*, No. 08-10720 (E.D. Mich.) (Hood, J.), and will be considered herein also.

## II.    STATEMENT OF FACTS AND ARGUMENTS

### A.    AGIS' Appeal

The instant appeal arises from the Bankruptcy Court's dismissal of Appellant AGIS' only remaining claim regarding the interpretation of a contractual provision, known as the Most Favored Customer clause ("MFC") of the "Capacity IRU Purchase Agreement", executed on January 5, 1998.  The IRU Agreement was a written contract governing the purchase of an indefeasible right of use ("IRU") of an optical transmission capacity.  The IRU Agreement would permit AGIS to utilize a nationwide fiber optic network that Qwest was constructing to carry internet communications and telephone voice traffic to interconnect 26 cities with the capability of transmitting 416,000 telephone calls among them.  Throughout the bankruptcy proceedings, AGIS argued, among other things, that the Appellee Qwest breached the MFC clause of the Capacity IRU Purchase Agreement resulting in approximately "$84 million in damages of lost transaction value."  The sole issue on appeal involves the interpretation, and

2

alleged breach of the MFC clause of the IRU Agreement.

        1.     The Parties and the Underlying Contract

As early as 1994, the Appellant AGIS was regarded as a major provider of regional and national data communications services, which include providing the internet to telecommunication carriers, and businesses. During this time, the Appellee Qwest was a regional telephone company that also provided other data-related services by selling access to a new fiber optic cable network that it was constructing across the nation. In the summer of 1997, AGIS initiated negotiations with Qwest in an effort to acquire additional capacity and a means to transport internet traffic across the country. The negotiations aimed at establishing a long-term contract under which Qwest would supply AGIS with capacity on Qwest's national fiber optic network. The negotiations spanned nearly six months, and on January 5, 1998, the parties executed the IRU Agreement, which became effective on March 26, 1998.

The central issue for the appeal involves a provision of the IRU agreement known as the MFC clause which provides:

> For a period beginning on the Execution Date and continuing for five years, the Cash Payment made by AGIS will be adjusted downward (and, after all payments due under Section 2.7 have been made, Qwest will pay rebates to AGIS) to the extent necessary to assure that the rate extended to AGIS for the Capacity IRU under this Agreement will be not greater than Qwest's best prevailing rate on a Comparable Sale of capacity on the Qwest owned network during such period. **A "Comparable Sale" will mean a sale of similar capacity or less on the Qwest System at the level at which AGIS is purchasing dedicated Bandwidth for a term of 20 years or less on Route Miles equal to or less than the Route miles of the AGIS network**, and Qwest will not otherwise engage in any transaction in a manner designed or intended to circumvent the foregoing limitations. Promptly upon such decrease, Qwest will provide AGIS with written notification of any decrease in Cash Payment and any change in the Deferred Payment Schedule resulting from such decrease or any rebate of amounts already paid under Section 2.7, which rebate will be due and payable within 30 days after receipt of such written notification.

3

[IRU Agreement § 9.2(c) (emphasis added)].  While there is conflicting opinion regarding the interpretation of the MFC clause, both parties generally agree on its purpose.  The MFC clause provided that any cash payment made by AGIS for the IRU would reflect any lower monetary rate given by Qwest in a "Comparable Sale."  AGIS, through witness testimony, submits that the MFC clause is a method to protect itself in terms of pricing.  It appears that the provision is a mechanism to ensure competitive pricing for the use of the telecommunications network, as AGIS was entering a long-term contract in a rapidly expanding technology market.  The parties engaged in extensive negotiations, and revisions of the MFC clause before the contract was finally executed.

<div align="center">2.   <u>Procedural History</u></div>

<div align="center">(i)   <i>Complaint</i></div>

AGIS initiated an action in 2002 seeking to recover damages arising from alleged breaches of the long-term telecommunications supply contract known as the IRU Agreement. This case was originally dismissed by the Bankruptcy Court in 2002, and ultimately reversed and remanded back to the Bankruptcy court by order of this Court.  Among other things AGIS argues that the breach of the MFC clause left AGIS "with a grossly priced IRU in a market with drastically falling prices."  AGIS argued that the price disparity caused by the breach of the MFC clause prevented strategic investors from either investing or acquiring AGIS.

<div align="center">(ii)   <i>Initial Motion for Summary Judgment</i></div>

Both parties engaged in extensive discovery that included more than twenty-five depositions, dozens of third-party subpoenas, and hundreds and thousands of pages of documents.  Prior to trial Qwest filed a motion for summary judgment, in which it argued that

<div align="center">4</div>

there was not a single genuine issue of material fact regarding the critical provisions of the IRU

Agreement, including the MFC clause.  On May 21, 2007, the Bankruptcy Court dismissed many

of the claims against Qwest, however it concluded that, as to the interpretation of the MFC

clause, genuine issues of material fact remained for trial.

<div align="center">(iii)     <em>Bankruptcy Court Ruling</em></div>

During the course of the very extensive bankruptcy proceedings both parties introduced

evidence regarding complex and technical concepts and terminology involving the MFC clause

and in particular, its "Comparable Sale" definition.  The bench trial included over 250 exhibits,

and witness/deposition testimony that spanned more than 700 pages of transcript that were

admitted into evidence.  The bench trial also included the testimony of several AGIS and Qwest

executives and experts who testified regarding the negotiation of the MFC clause, alleged

breaches of the MFC clause, and potential damages.  At the close of AGIS' proofs Qwest made a

Fed. R. Bank. P. 7052 motion to dismiss (similar to Fed. R. Civ. P. 52) AGIS' remaining claim

asserting that Qwest breached the MFC clause.  The Bankruptcy Court granted Qwest's second

motion for summary judgment, and dismissed AGIS' claim for breach of the MFC clause.  On

January 29, 2008, the Bankruptcy Court found that under its interpretation of the MFC clause,

that Qwest had not breached the provision as no "Comparable Sale" triggered the provision.

More specifically, it interpreted "Comparable Sale" to include a requirement that the sale be for

the same OC-48 level of Bandwidth sold to AGIS, and because Qwest made no such sale while

the IRU Agreement was in effect, it could not be held liable for breaching the MFC clause.

3.     <u>MFC Clause Interpretation</u>

The only remaining issue on appeal is whether the Bankruptcy Court's interpretation of

<div align="center">5</div>

the MFC clause was correct.  However, in order to understand the varying interpretations it is

first necessary to understand some of the critical contractual terminology.

(i)     *Terminology*

The IRU Agreement governed AGIS' purchase of a twenty-year "indefeasible Right of

Use" ("IRU"), in a quantity of dedicated fiber optic transmission "capacity."  The IRU

Agreement contemplated the future completion of a larger fiber-optic network that Qwest was

constructing, therefore, the targeted completion and acceptance date for the IRU Agreement was

for March 25, 2000.  As the IRU Agreement contains various technical terms, that were later

subjected to different interpretations, the following terms come directly from the definition

section of the IRU Agreement:

"*Execution Date*" has the meaning set forth in the introductory paragraph of this

agreement (i.e. January 5, 1998).

"*Cash Payment*" has the meaning specified in Section 2.7 of this Agreement.[1]

"*Capacity IRU"* has the meaning specified in Section 2.1 of this Agreement.[2]

---

[1] Section 2.7 provides: For the purposes of this agreement, the 'Cash Payment' will be equal to (i) the Selected Route Miles divided by 10,000 multiplied by (ii) $310,000.00.

[2] Section 2.1 provides: Subject to the terms and conditions of this Agreement, Qwest hereby grants to AGIS an Indefeasible Right of Use of this Capacity on the Qwest System (the "Capacity IRU") for the economically useful life of the AGIS Network, as determined pursuant to Section 6.1 hereof, effective upon the Completion and Acceptance of the AGIS Network as provided in Sections 2.3, 2.4, or 2.5 as applicable.  As used here in, the "Capacity" means dedicated optical transmission capacity at an OC-48 level, as permitted by this Agreement, on the Selected Route Miles, subject to any permitted substitutions of Selected Route Miles of the Qwest System being referred herein to as the "AGIS Network").  Qwest will use commercially reasonable efforts to commence providing AGIS with the Capacity on the AGIS Network no later than two years after the Effective Date.

6

"*Qwest System*" has the meaning specified in Recital A of this Agreement.[3]

"*Capacity*" has the meaning specified in Section 2.1[4]

"*Bandwidth*" means one or more Bandwidth Units.[5]

"*Route Miles*" means one mile of the actual geographic length of the fiber route.

[IRU Agreement § 1.1 Definitions].

Much of the parties dispute concerns the contracted "capacity" that AGIS was purchasing on Qwest fiber-optic telecommunications system. Both parties agree that the IRU Agreement between AGIS and Qwest contemplated a network with an OC-48 data transmission rate (or speed) over approximately 10,000 route miles. AGIS argues that capacity is limited to the rate or speed of the data transmission. However, Qwest submits that this "quantity of capacity" is actually comprised of two components: (1) a rate (or speed) of data transmission, and (2) the distance over which that transmission would be provided. Qwest further provides that in the telecommunications industry, data transmission rates (or speeds) are commonly expressed as levels of "bandwidth." "DS-0" is the lowest level of bandwidth and the transmission speed of a standard telephone line, comparably a "DS-3" bandwidth is 672 times faster than the DS-0. Here, the IRA Agreement contemplated an OC-48 level of bandwidth which was 56 times faster than the DS-3. The second component, distance, is customarily described as "route miles."

_____

[3] Recital A provides: Qwest is constructing a nationwide continuous fiber optic communication system (the "Qwest System")...

[4] See footnote 2.

[5] "Bandwidth Units" means a particular OC-3, OC-12, OC-48, or OC-192. The "OC-3" means OC-3 SONET optical transmission capacity meeting the Network Specifications. "OC-12" means OC-12 SONET optical transmission capacity meeting the Network Specifications. "OC-48" means OC-48 SONET optical transmission capacity meeting the Network Specifications.

Route miles represent the actual length of the of the optical fiber employed to connect points included in the network. Qwest further describes that these route miles are typically measured in "V&H miles," which are straight-line vertical and horizontal distances between a network's cities. Qwest submits that the "V&H miles" could not be established until the AGIS networks were actually defined and completed, and until then Route Miles were utilized as estimates. The gravamen of parties varying interpretations involves the role that these elements play in determining what is considered a "Comparable Sale."

(ii)     *Appellant's Interpretation*

AGIS submits that Qwest breached the MFC clause by entering into several Comparable Sales, at lower rates, of similar capacity or less than the OC-48 level called for in the IRU Agreement. AGIS alleges that the MFC clause was breached on at least more than one occasion based on its interpretation of the MFC Clause. The pertinent provision of the MFC clause provides a definition of "Comparable Sale":

> "Comparable Sale" will mean a sale of similar capacity or less on the Qwest System at the level at which AGIS is purchasing dedicated Bandwidth for a term of 20 years or less on Route Miles equal to or less than the Route Miles of the AGIS Network.

AGIS submits, through the testimony of its executive officers and expert witnesses, that a "Comparable Sale" possessed three criteria: (1) bandwidth or capacity equal to *or less* than OC-48, (2) that the miles would be equal to or less than 10,440 route miles, (3) and that the term would be equal to or less than 20 years. Of central importance is its interpretation of the phrase *"similar capacity or less"* referring to a bandwidth level of OC-48 or less. AGIS alleges that this interpretation of the subject provision was essential to ensuring that AGIS would remain competitive as its capacity price would remain at the prevailing market rate. Additionally, AGIS

8

argues that this interpretation is consistent with the understanding of several of its executives that were involved in contract negotiations.  AGIS further provides that this interpretation is consistent with early drafts of the of the subject provision.

<div align="center">(iii)   <em>Appellee's/Bankruptcy Court's Interpretation</em></div>

Qwest interpretation of the same provision, which was upheld by the Bankruptcy Court, varies slightly from AGIS' interpretation.  Qwest suggests that a "Comparable Sale" involves four elements: (1) A sale of similar capacity or less on the Qwest system, (2) at the level at which AGIS is purchasing dedicated Bandwidth, (3) for a term of 20 years or less, (4) on Route Miles equal to or less than Route Miles of the AGIS network.  The essential difference involved the second element - the requirement that the Comparable Sale be "at the level at which AGIS is purchasing dedicated Bandwidth." - which unlike the other elements does not involve the phrase "or less."  Qwest submits that this omission established a necessary characteristic of a "Comparable Sale": it would be for the <em>same</em> OC-48 bandwidth level, and not OC-48 or less, as the Appellant argues.  Qwest further submits that because there were no sales at the OC-48 level, there were no possible beaches of the MFC clause. The Bankruptcy Court found merit in this interpretation and dismissed the MFC clause claim, and consequently the entire action.  In support of its interpretation, Qwest relies on various portions of the definition section, as well as executive testimony.

**B.    Qwest's Cross-Appeal**

Qwest Communications Corporation ("Qwest") has cross-appealed the Official Committee of Unsecured Creditors of Apex Global Information Services, Inc., and McTevia & Associates, Inc., as Liquidating Agents of A.P. Liquidating Co. f/k/a Apex Global Information

<div align="center">9</div>

Services ("A.P. Liquidating"), which will be considered herein.  The Cross-Appeal argues that the Bankruptcy Court did not have subject matter jurisdiction when the adversarial action was initiated against Qwest.  More specifically, Qwest alleges that the Committee of Unsecured Creditors lacked standing because it did not have any committee members who met the qualifications for standing at the time the Complaint was filed.  In the same vein, Qwest also challenges the Bankruptcy Court's denial of its motion to conduct discovery on the matter of whether the only alleged creditor was properly a member of the committee at the time the adversary proceeding was filed.

        1.    <u>Procedural History</u>

The underlying bankruptcy action was initiated by AGIS' Voluntary Petition under Chapter 11 of the Bankruptcy Code, on February 25, 2000.  On March 17, 2000, the United States Trustee appointed a Committee of Unsecured Creditors ("Commitee"), composed of: ITC DeltaCom Communications, AT&T Corp., Focal Communications Corp., and MCI WorldCom. This Committee had the exclusive authority to commence, continue or settle any adversary proceeding or pursue any claim of the Debtor.  On May 16, 2000, the Bankruptcy Court entered an order approving the sale of substantially all of AGIS' assets and the assumption/assignment of certain executory contracts.

AGIS filed its Combined Plan and Disclosure Statement on June 26, 2000 ("the Plan"). The Bankruptcy Court approved AGIS' Plan of reorganization on August 9, 2000.  Under the Plan, the Committee would have exclusive authority to commence, continue or settle any adversary proceeding or pursue the claims of AGIS.  The Bankruptcy Court appointed McTevia & Associates as the liquidating agent to assist the Committee in performing its responsibilities.

10

On May 4, 2001, the Court entered an order disallowing certain claims, including the claims of the Committee members.

The adversary claim out of which the instant litigation arose was initiated on March 29, 2002. Five years after the filing of the complaint, the lawyers for both the Committee and Qwest attempted to resolve the claim through mediation on June 29, 2007. At the start of the mediation, Qwest refused to participate in the absence of a representative from the Committee with authority to settle. During this mediation, it was determined that all of the Committee members had resigned except for AT&T. Subsequent to the mediation, AT&T indicated that it no longer wished to participate on the Committee. Counsel for the Committee then requested that the U.S. Trustee appoint new Committee members; however, the U.S. Trustee denied the request. As a result, AT&T, as the sole Committee member, agreed to appoint additional members prior to its resignation. On July 23, 2007, AT&T appointed Argo Partners; Lynn Bateman; and Binder & Malter, LLP, as new Committee members. On July 31, 2007, AT&T sent its letter of resignation from the Committee.

After learning of the appointment of new committee members, and that AT&T was no longer on the Committee, Qwest began to challenge the subject matter jurisdiction of the Bankruptcy Court. At the commencement of the trial on July 31, 2007, the Bankruptcy Court instructed the U.S. Trustee to appoint new committee members. Also on the trial date, the Bankruptcy Court took under advisement Qwest's oral motion to dismiss for lack of subject matter jurisdiction, but required the U.S. Trustee to submit certain questions to AT&T in order to verify its status on the committee when the lawsuit was filed, and when new committee members were approved. AT&T responded to this request by letter dated August 10, 2007, in which it

11

asserted that: (1) its claims were cured or extinguished by the order of May 4, 2001, but that the claims register showed that AT&T still held an $800,000 claim;(2) AT&T asked for a distribution schedule in early 2007; and (3) recounting its role in appointing new members to and resignation from the Committee.

At a September 10, 2007 hearing, the Bankruptcy Court suggested that it was more appropriate for the U.S. Trustee to appoint new members to the Committee instead of AT&T. On September 28, 2007, the U.S. Trustee appointed the same members to the Committee that AT&T had previously appointed.

2.    The Bankruptcy Court Ruling

On December 20, 2007, the Bankruptcy Court denied Qwest's motion to dismiss for lack of subject matter jurisdiction, and concluded that AT&T was a member of the committee until its resignation.  In so doing, the Bankruptcy Court principally relied on the requirements of committee members set forth in 11 U.S.C. § 1102, which the Bankruptcy Court noted, by its terms does not require an ongoing review of the status of claims held by the committee members. The Bankruptcy Court also noted that § 1102 did not provide for the automatic disqualification and removal of duly appointed committee members as the result of post-appointment satisfaction or disallowance of their claims.  Further, the Bankruptcy Court was persuaded by analogous authority where other courts removed members from a creditor committee, but did not void the committee's actions prior to the removal.  Finally, the Bankruptcy Court found the concepts from the class action context instructive.  In particular, the Bankruptcy Court equated the unsecured creditors committee with the named members of a class action suit, finding that both are representative of an entire class.  As such, a class action suit would continue, even if the

12

named parties no longer have standing because they, like the committee members, serve in a representative capacity even if their individual claims are extinguished.  The denial of Qwest's motion to dismiss for want of jurisdiction forms the basis of the cross-appeal.

## III.   STANDARD OF REVIEW

### A.   AGIS' Appeal

Pursuant to 28 U.S.C. § 158(a)(1), "[t]he district courts of the United States shall have jurisdiction to hear appeals (1) from final judgments, orders, and decrees... of bankruptcy judges....  An appeal under this subsection shall be taken only to the district court for the judicial district in which the bankruptcy judge is serving."

A bankruptcy court's findings of fact are reviewed under the clearly erroneous standard. *Booher Enters v. Eastown Auto. Co. (In re Eastown Auto Co.)*, 215 B.R. 960, 963 (B.A.P. 6th Cir. 1998)(citing Fed. R. Bankr. P. 8013). "A finding of fact is clearly erroneous 'when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'" *Id.* at 963-64 (quoting *Anderson v. City of Bessemer*, 470 U.S. 564, 573 (1985)).

A bankruptcy court's conclusions of law are reviewed de novo.  *Id.* at 964 (citing *Nicholson v. Isaacman (In re Issacman)*, 26 F.3d 629 (6th Cir. 1994)).  Contract interpretation is reviewed de novo.  *See In re Brunswick Apartments of Trumball County, Ltd.*, 215 B.R. 520, 522 (B.A.P. 6th Cir. 1998) (citing *United States v. Century Offshore Mgmt. Corp. (In re Century Offshore Mgmt. Corp.)*, 111 F.3d 443 (6th Cir. 1997); *see also Sault Ste. Marie Tribe of Chippewa Indians v. Engler*, 146 F.3d 367, 373 (6th Cir. 1998) ("The determination of whether a contract is ambiguous, thereby making extrinsic evidence admissible for interpretive purposes, is

question of law and therefore subject to de novo review.") (citing *Wulf v. Quantum Chem. Corp.*, 26 F. 3d 1368, 1376 (6th Cir. 1994). "Under a *de novo* standard of review, the reviewing court decides an issue independently of, and without deference to, the trial court's determination." *Menninger v. Accredited Home Lenders (In re Morgenson)*, 371 B.R. 798, 800 (B.A.P. 6th Cir. 2007).

Rule 56 of the Federal Rules of Civil Procedure governs summary judgment motions in bankruptcy court adversary proceedings. *Rowell v. Chase Manhattan Auto. Finance Corp. (In re Rowell)*, 359 F. Supp. 2d at 647 (W.D. Mich. 2004) (citing Fed. R. Bankr. P. 7056). A motion for summary judgment is properly granted if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).

### B.    Qwest's Cross-Appeal

The gravamen of the cross-appeal centers on A.P. Liquidating's standing, and as such necessitates de novo review. *Stevenson v. J.C. Bradford & Co. (In re Cannon)*, 277 F.3d 838, 852 (6th Cir. 2002). "De novo means that the appellate court determines the law independently of the trial court's determination." *Lyon v. Eiseman (In re Forbes)*, 372 B.R. 321, 325 (B.A.P. 6th Cir. 2007). The cross-appeal also concerns the Bankruptcy Court's denial of additional discovery, which receives abuse-of-discretion review. *Int'l Union v. General Motors Corp.*, 497 F.3d 615, 625 (6th Cir. 2007); *Official Unsecured Creditors' Committee of Valley-Vulcan Mold Co. v. Ampco-Pittsburgh (In re Valley-Vulcan Mold Co.)*, 237 B.R. 322, 326 (B.A.P. 6th Cir. 1999). "An abuse of discretion occurs only when the [bankruptcy] court 'relies upon clearly erroneous findings of fact or when it improperly applies the law or uses an erroneous legal standard.'" *In re Valley-Vulcan Mold Co.*, 237 B.R. at 326.

14

IV.     **LAW & ANALYSIS**

A.     **AGIS' Appeal**

Appellant AGIS seeks an order reversing the decision of the Bankruptcy Court with respect to the MFC clause, and remanding the proceeding to the Bankruptcy Court for the resumption of trial.  In support of its Appeal, AGIS argues that the Bankruptcy Court's interpretation of the MFC clause is contrary to law and fact for three reasons: (1) its construction of the clause ignores settled principles of contract interpretation; (2)  its construction of the clause ignores evidence of the parties' intent; and (3) its construction undermines the purpose of the MFC clause.  In opposition, the Appellee Qwest argues that the Bankruptcy Court's interpretation of the MFC clause should be affirmed as it was compelled by relevant contract language, and was read in a way to give effect to all of its terms.  Qwest further argues that the Bankruptcy Court's interpretation of the MFC clause renders it fair and reasonable, as compared to the harsh results that AGIS' interpretation yields.  Qwest also submits an alternative ground for dismissal by arguing that the MFC clause requires a cash payment before it is triggered, and because there was no cash payment ever received the instant action should be dismissed.

The parties have agreed this dispute is governed by Delaware law pursuant to a choice of law provision in the IRU Agreement.[6]  As the Supreme Court of Delaware explained, "[i]t is an elementary canon of contract construction that the intent of the parties must be ascertained from the language of the contract."  *Citadel Holding Corp. v. Roven*, 603 A.2d 818, 822 (Del.1992) (citing *Myers v. Myers*, 408 A.2d 279 (Del. 1979); *Dupont v. Wilmington Trust Co.*, 45 A.2d

---

[6] Section 17.2 of the IRU Agreement provides, "[t]his agreement will be governed by and construed in accordance with the domestic laws of the State of Delaware, without reference to its choice of law principles."

510, 517 (Del. Ch. 1946)).  Construction of contract language is a question of law.  *See Rhone-*

*Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1195 (Del. 1992).  The

primary consideration in interpreting a contract is to "attempt to fulfill, to the extent possible, the

reasonable shared expectations of the parties at the time they contracted." *See Comrie v.*

*Enterasys Networks, Inc.*, 837 A.2d 1, 13 (Del. Ch. 2003).  In ascertaining intent, Delaware

courts adhere to the "objective" theory of contracts.  *See Haft v. Haft*, 671 A.2d 413, 417 (Del.

Ch. 1995).  Under this approach, a contract's "construction should be that which would be

understood by an objective reasonable third party." *R.E. Haight & Assocs. v. W.B. Venables &*

*Sons, Inc.*, C.A. No. 94C-11-023, 1996 Del. Super. Lexis 445, 1996 WL 658969, at *3 (Del.

Super. Ct. Oct. 30, 1996).  Accordingly,

> Where parties have entered into an unambiguous integrated written contract, the
> contract's construction should be that which would be understood by an objective
> reasonable third party.  An inquiry into the subjective unexpressed intent or
> understanding of individual parties [to the contract] is neither necessary nor
> appropriate where the words of the contract are sufficiently clear to prevent
> reasonable persons from disagreeing as to their meaning.

*Demetree*, 1996 Del. Ch. Lexis 112, 1996 WL 494910, at *4 (internal citation omitted); *accord*

*Eagle Indus., Inc. v. DeVilbiss Health Care, Inc.*, 702 A.2d 1228, 1232 (Del. 1997) ("Contract

terms themselves will be controlling when they establish the parties' common meaning so that a

reasonable person in the position of either party would have no expectations inconsistent with

the contract language.")  The Court, therefore, must determine whether the contractual language

in dispute, when read in the context of the entire contract, is ambiguous.

Ambiguity exists only when a contractual provision is "reasonably or fairly susceptible of

different interpretations or may have two or more different meanings." *Rhone-Poulenc*, 616

A.2d at 1196.  Contractual language "is not rendered ambiguous simply because the parties do

16

not agree upon its proper construction." *Id.; see also City Investing Co. Liquidating Trust v. Cont'l Cas. Co.*, 624 A.2d 1191, 1198 (Del. 1993) (finding contract language is not ambiguous "simply because the parties in litigation differ concerning its meaning."). The test is not the parties' subjective intent, but rather "what a reasonable person in the position of the parties would have thought" the contract provision meant." *Kaiser Aluminum Corp. v. Matheson*, 681 A.2d 392, 395 (internal citations omitted); *see also Emerson Radio Corp. v. Orion Sales, Inc.*, 253 F.3d 159, 164 (3d Cir. 2001) (stating that a court must "determine if there [are] objective indicia that ... the terms of the contract are susceptible to different meanings") (internal citations omitted).

It is undisputed that the interpretation of the "Comparable Sale" provision of the MFC clause is determinative of the instant appeal. If the Court were to adopt the interpretation advanced by AGIS, the record demonstrates that several transactions should have triggered the MFC clause, and result in a "downward adjustment" in payments owed by AGIS. On the other hand, if this Court were to adopt the interpretation asserted by Qwest, no past transaction could be characterized as a "Comparable Sale," and as such summary judgment is warranted. With the aforementioned principles of contract interpretation in view, this Court is persuaded that the MFC clause is unambiguous, and the "Comparable Sale" definition restricts such a sale to one "at the level at which AGIS is purchasing dedicated Bandwidth," namely sales at the OC-48 level. As no such sale ever occurred, the Bankruptcy Court appropriately found that Qwest was entitled to summary judgment. Indeed, for the sake of analysis, the definition is worth repeating:

> A "Comparable Sale" will mean a sale of similar capacity or less on the Qwest System at the level at which AGIS is purchasing dedicated Bandwidth for a term of 20 years or less on Route Miles equal to or less than the Route Miles of the AGIS Network...

17

It is precisely this definition of "Comparable Sale" on which the parties hinge their divergent interpretations. According to AGIS, this definition was intended to capture all sales that satisfied three criteria: (1) OC-48 or less; (2) 20 years of useful life or less; and (3) 10,440 Route Miles or less. To the contrary, Qwest's interpretation varies in one significant respect: the sale must be for OC-48, as opposed to OC-48 *or less*. For the forthcoming reasons, this Court is convinced that the construction provided by Qwest's is the one "which would be understood by an objective reasonable third party" *R.E. Haight & Associates*, 1996 Del. Super. Lexis 445, *3.

At the outset, the Court recognizes that Qwest's interpretation – construing the phrase "at the level at which AGIS is purchasing dedicated Bandwidth" to mean OC-48 – is supported by an axiomatic principle of contract interpretation. More specifically, that a contract must be construed as a whole, giving effect to all of its provisions and avoiding a construction that would render any of those provisions illusory or meaningless. *Sonitrol Holding Co. v. Marceau Investtissements*, 607 A.2d 1177, 1883-84 (Del. 1992) ("The cardinal rule of contract construction is that, where possible, a court should give effect to *all* contract provisions.") (emphasis in original). Consistent with this principal, Qwest's interpretation provides significant meaning to all of the elements of the "Comparable Sale" definition. There is no meaningful dispute regarding two of the four elements, namely, "for a term of 20 years or less," and "on Route Miles equal to or less than Route Miles of the AGIS Network." However, the parties square off over the meaning accorded the to the two remaining elements of the "Comparable Sale" definition: (1) "a sale of similar capacity or less," and (2) "at the level at which AGIS is purchasing dedicated Bandwidth." Only Qwest's interpretation accords reasonable meaning to these remaining terms.

18

The parties most fiercely contest the definition of "capacity," contained in the contractual phrase "a sale of similar capacity or less."  According to AGIS, capacity (which it argues is synonymous with bandwidth) should be interpreted to mean "OC-48," and consequently, a comparable sale is one that includes "OC-48" or less.  AGIS arrives at this conclusion based in large part on the understanding and testimony of trial witnesses, in addition to citations from telecommunications references.  In so doing, AGIS argues that Qwest's interpretation of the term "capacity" is not supported by either the factual record, or the common industry usage of the term.  Such arguments would be convincing, if not undermined by the meaning assigned to the term "capacity" in the definition section – which further substantiates Qwest's construction of the term.  *Lorillard Tobacco Co. v. American Legacy Foundation*, 903 A.2d 728, 738 (Del. 2006) ("Under well-settled case law, Delaware courts look to dictionaries for assistance in determining the plain meaning of terms which are *not* defined in a contract.") (emphasis added).  Although not a model of contractual draftsmanship, the MFC clause cannot be properly construed as ambiguous, and therefore, not subject to reinterpretation through the use of extrinsic evidence. *Eagle Indus.*, 702 A.2d at 1232 ("If a contract is unambiguous, extrinsic evidence may not be used to interpret the intent of the parties, to vary the terms of the contract or to create an ambiguity."); *see also United Rentals, Inc. v. RAM Holdings, Inc.*, 937 A.2d 810, 830 (Del. Ch. 2007) ("Ambiguity does not exist simply because the parties disagree about what the contract means").

Qwest persuasively asserts that the definition of "capacity" in the phrase "similar capacity or less," is properly construed as being the product of two components: (1) rate/speed of data transmission, and (2) the distance over which the transmission rate would be divided (as is

customarily measured in "V&H miles").  According to Qwest, such an interpretation, as recognized by the Bankruptcy Court, is consistent with the two-tier definition of "Capacity" as expressly defined in Section 2.1 of the IRU [7], which includes both a transmission capacity element, and a distance element.  The term "capacity" in the definition of "Comparable Sale" is not capitalized, however, as demonstrated below, this distinction does not undermine the overall import of the relevant definitions when read in concert.  Contrary to AGIS' assertion, Qwest interpretation does not render the phrase "similar capacity or less" obsolete, but rather this phrase excludes from the definition of "Comparable Sale" any sales that involve a larger quantity of capacity (i.e. greater DS-0 and V&H miles).  Additionally, even AGIS' own expert witness on damages, Mark Spragg, utilized a similar conception of capacity for the purposes of calculating potential damages.  (Expert Report of Mark C. Spragg, Apellant's Appeal, Ex K, p. 10).

AGIS' interpretation of the "Comparable Sale" definition renders the phrase "at the level at which AGIS is purchasing dedicated Bandwidth" meaningless or redundant.  Indeed, AGIS concedes that under its interpretation the phrases "at the level," and "capacity" were intended to be synonymous as referring to OC-48.  (Appellant's Appeal, P.21).  The problem with AGIS' interpretation is that it does not provide a reasonable explanation for the phrase "at the level at which AGIS is purchasing dedicated Bandwidth."  Instead, AGIS attempts to explain this phrase as an unintended drafting oversight, that was carried over from the predecessor language contained in the October 22, 1997 Letter of Intent.  (Appellant's Reply to Appellee's Brief on Appeal, p. 8).  Such an extrinsic explanation is insufficient to evade the limiting effect of contractual the phrase "at the level at which AGIS is purchasing dedicated Bandwidth."

_____

[7] *See* footnote 2.

On the contrary, Qwest correctly construed this controlling language as limiting all "Comparable Sales" to the OC-48 level.  The interpretation urged by Qwest garners further support when examined in light of the definition section of the IRU Agreement.  In particular, Section 1.1 defines "Bandwidth" as "one or more Bandwidth Units" and Bandwidth Units as "a particular OC-3, OC-12, OC-48, or OC-192."  As such, the subject phrase – "at the level at which AGIS is purchasing dedicated Bandwidth" – is buttressed by the fact that Section 2.1 refers to OC-48 as the "level" of capacity.  In sum, the more appropriate phrase to represent the controlling OC-48, is not "capacity" as urged by AGIS, but "level" as demonstrated by the definition sections of the IRU Agreement.

Finally, both parties argue that the other's interpretation would either yield harsh results or undermine the purpose of the MFC clause.  AGIS' argument is based upon the premise that Qwest's interpretation conflates bandwidth and route miles under the guise of "capacity," which AGIS contends renders the "on Route Miles equal to or less than Route Miles of the AGIS Network" redundant.  However, this Court finds that its previous analysis of the Qwest interpretation of "capacity" adequately addresses this perceived redundancy.  In sum, the purported redundancy is avoided based upon the distinction between Route Miles and V&H miles, and the limiting function of the phrase "similar capacity or less."   According to Qwest, AGIS's interpretation yields harsh results by expanding the definition of "Comparable Sale" to include even the "sale of infinitesimally small transmission capacity at the lowest level of technology." (Appellee's Resp., p. 16)  In support of this proposition, Qwest cites the trial testimony of AGIS' witness Phillip Lawler, who when responding to a hypothetical, conceded that even the sale of a single DS-0 circuit connecting two close locations would trigger the MFC

21

clause if it were to sale for a lower rate than OC-48.  (Appellee's Resp., p. 16).  Although

recognizing the hypothetical nature of the above cited response, this Court still finds the

argument well-taken.  This Court is persuaded that AGIS' interpretation of the "Comparable

Sale" definition could yield harsh and unreasonable results.  As previously noted, AGIS'

interpretation would encompass all sales at (1) OC-48 or less, (2) 20 years of useful life or less,

and (3) 10,440 route miles or less.  Such an interpretation appears to, at a minimum, undermine

the purpose of the MFC Clause by subsuming sales of a much smaller magnitude, and thereby

adjusting AGIS' rate by every transaction that was less than OC-48, provided it met the other

two criteria.  As such, the definition of a "Comparable Sale," appears to exceed the bounds of

what should properly be construed as comparable, like, or similar transactions.

Based on the foregoing, this Court concludes that Qwest's interpretation of the subject

contract provision gives meaning to all of the contractual terms, is consistent with the contract as

a whole, and is less likely to yield harsh and unreasonable results.  In so doing, the Court

recognizes that the subject provision is far from a model of clarity, however, "it is not the

prerogative of the judiciary to rewrite contracts in order to rescue parties from their 'improvident

commitments.'" *Noe v. Polyone Corporation*, 520 F.3d 548, 564 (6th Cir. 2008).

**B.**     **Qwest's Cross-Appeal**

1.     <u>Subject Matter Jurisdiction</u>

Qwest challenges the subject matter jurisdiction of the Bankruptcy Court over the instant

adversary proceeding.  Specifically, Qwest argues that the Bankruptcy Court should have

dismissed the adversarial action because the Committee lacked standing as none of its members

met the Bankruptcy Code's requirements for participating as a committee member.  In other

22

words, Qwest submits that in order for the Bankruptcy Court to have subject matter jurisdiction, AGIS must show that the instant suit was authorized by an unsecured creditors' committee composed of members who have met the requisite requirements set forth in 11 U.S.C. § 1102. According to Qwest, § 1102 precludes creditors whose claims have been satisfied from participating in an unsecured creditors' committee.  In so arguing, Qwest avers that the qualifications enumerated in § 1102 were meant to mirror Article III's standing requirements by excluding individuals who do not have an actual stake in the outcome of the proceedings, i.e. excluding those who are not actual and current creditors of the debtor.  As a result, Qwest claims that no party could properly authorize the suit because AT&T, the sole Committee Member,  no longer held an active claim or debt against AGIS at the time the instant proceeding was authorized.  Consistent with these assertions, Qwest also challenges the Bankruptcy Court's finding that AT&T remained a member of the Committee, and the Bankruptcy Court's ultimate denial to permit further discovery on this issue.

In response, AGIS provides several reasons which refute Qwest's interpretation of the principle of standing and the requirements of committee members under § 1102.  First, AGIS submits that no authority demonstrates that a committee member must be removed once their claim has been satisfied.  Secondly, in cases where removal is appropriate, i.e. breach of fiduciary duty, courts have not invalidated the actions of the committee prior to the removal. Thirdly, AGIS relies on principles from the class action context, namely, where class standing endures even in the absence of the named representative parties.  Finally, AGIS asserts that the proper time for determining the eligibility of members for a creditors' committee is at the time of their appointment, and subsequent events should not render them disqualified.  With regard to

23

the Bankruptcy Court's denial of additional discovery as to AT&T's status on the Committee,

AGIS argues that the denial was proper because it was properly supported by evidence in the

record, and Qwest had ample opportunity to pursue discovery on the during issue the preceding

five (5) years.

Qwest's standing arguments spring from the language of §1102, governing the

appointment of members to creditors' and equity security holders' committees, which in

pertinent part provides:

> **(a)(1)** Except as provided in paragraph (3), as soon as practicable after the order
> for relief under chapter 11 of this title, the United States trustee shall appoint a
> committee of creditors holding unsecured claims and may appoint additional
> committees of creditors or equity security holders as the United States trustee
> deems appropriate.
> ....
>
> **(b)(1)** A committee of creditors appointed under subsection (a) of this section
> shall ordinarily consist of the persons, willing to serve, that hold the seven largest
> claims against the debtor of the kinds of represented on such committee, or of the
> members of a committee organized by creditors before the commencement of the
> case under this chapter, if such committee was fairly chosen and is representative
> of the different kinds of claims to be represented.

11 U.S.C. § 1102(b)(1).

The Bankruptcy Code provides that in a chapter 11 case the United States trustee "shall

appoint a committee of creditors holding unsecured claims..." 11 U.S.C. § 1102(a)(1).    "The

committee's primary function is to advise the creditors of their rights and proper course of

conduct in bankruptcy proceedings." *In re National Liquidators, Inc.*, 182 B.R. 186, 191 (S.D.

Ohio 1995); *Official Committee of Unsecured Creditors of Cybergenics Corp. v. Chinery*, 330

F.3d 548, 562 (3d Cir. 2003).  Section 1102 (a) requires the U.S. trustee to appoint at least one

committee of creditors, and potentially more if the U.S. trustee finds it appropriate.  The court

24

may also "order the appointment of additional committees of creditors ... if necessary to assure

adequate representation of creditors."  § 1102(a)(2).  The composition of the statutory committee

is governed by § 1102(b) and "ordinarily consists of the persons, willing to serve, that hold the

seven largest claims against the debtor of the kinds represented on such committee."  The powers

and the duties of the committee are described in § 1103(c) and include: consultation with the

trustee or debtor in possession; investigation of acts, conduct, assets, liabilities, and financial

condition of the debtor; participation in the formulation of a plan; requesting the appointment of

a trustee; and other services that are in the interest of those represented.  § 1103(c).  At the heart

of the instant dispute are the prerequisites necessary for appointment to and remaining on an

unsecured creditors' committee.

In order for an unsecured creditor to be properly appointed to a committee, it must

generally comply with three prerequisites set forth under § 1102 (b)(1).  More specifically,

committee members: (1) are "persons" as defined by § 101(41) of the Bankruptcy Code; (2) hold

a "claim[8]" against the debtor, generally one of the seven largest; and (3) those claims must be

"unsecured."  *See In re Bennett*, 17 B.R. 819, 820 (Bankr. N.M. 1982); *In re Barney's, Inc.*, 197

B.R. 431, 440 (Bankr. S.D.N.Y. 1996) ("All creditors holding unsecured claims are eligible for

committee membership."); *In re Vermont Real Estate Inv. Trust*, 20 B.R. 33, 35 (Bankr. Vt.

1982); *In re Kontaratos*, 15 B.R. 298, 300 (B.A.P. 1st Cir. 1981) ("The level of inquiry is

superficial and involves simply a qualification that the person is an unsecured creditor and is

willing to serve.")  Both parties agree that at the time that the Committee was initially appointed

---

[8] "Claim" is broadly defined in §101(5)(a) of the Code as a "right to payment, whether or
not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured,
unmatured, disputed, undisputed, legal, equitable, secured, or unsecured."

25

that all of the members satisfied these preliminary criteria.

At the outset, the Court notes that Qwest has provided no authority that demonstrates that the failure to satisfy these eligibility requirements implicate Article III standing considerations. Qwest's novel arguments conflate requirements for proper eligibility on a creditors' committee with the standing requirements of Article III. The parties dispute more appropriately concerns a much narrower question: once a creditor has been appointed to an unsecured creditors' committee if its claim is subsequently satisfied must it be removed from the committee? In other words, what Qwest proposes is a rule that would have the effect of per se removal of any committee member whose claims were no longer viable.

The Court agrees that both reason and statute support the principle that at the *appointment* of the creditors' committee, all of the members should meet the elements set forth in § 1102 (b)(1); however, this Court declines to adopt a per se rule invalidating committee membership if that claim is subsequently satisfied. To be sure, the most reasonable course of action for a creditor who no longer has interest in a case is to resign from the committee and allow other creditors with viable claims to assume its place. *See In re Schatz Federal Bearings Co., Inc.*, 11 B.R. 363, 365 (Bankr. S.D.N.Y. 1981). Yet, in this Court's opinion, the failure to do so does not necessarily invalidate the committee's subsequent actions.

An unsecured creditor's eligibility to serve on a § 1102 committee is determined at the time of appointment. This principle is most clearly demonstrated by the temporal mandate of § 1102(a)(1) requiring the U.S. trustee to appoint the committee "as soon as practicable after the order for relief." In furtherance of this point, AGIS cites several cases which provide several iterations of the same point, namely, the U.S. trustee frequently appoints or retains committee

members despite the contingent or disputed nature of their claims.  *See In re Barney's, Inc.*, 197

B.R. at 440-41 (Court found the creditor had a viable claim for purposes of remaining on

committee where creditor's claim was wholly contingent upon debtor's withdrawal from a multi-

employer pension plan – which debtor indicated it would not withdrawal from); *In re Laclede

Cab Co.*, 145 B.R. 308 (Bankr. E.D. Mo. 1992) (holder of disputed claim may serve on

creditor's committee); *see generally* COLLIER ON BANKRUPTCY P-1102.02 (Allan N. Resnick &

Henry J. Sommer eds., 15th ed. rev. 2008) ("The courts have been nearly unanimous in holding

that holders of disputed claims are eligible to serve on creditor's committees") (citing cases).

These cases tend to demonstrate that the contingent nature of claims, even when recognized and

disputed at the formation of a creditors' committee, was not a bar to the creditors' eligibility to

serve on the unsecured creditors' committee.

The unique circumstances surrounding this case lead to an inevitable dearth of case law,

as referenced by both parties.  Yet, Qwest provides no authority demonstrating the automatic

disqualification  of a committee member once its claim has been satisfied.  Indeed, as highlighted

by the Bankruptcy Court, there are no provisions that require on an ongoing review of the status

of the committee members' claims. Instead, the Bankruptcy Code does provide additional

mechanisms by which certain parties can challenge or augment, through motion, the composition

of the committee membership.  More specifically, § 1102(a)(4) provides that "[o]n request of a

party in interest and after notice and a hearing, the court may order the United States trustee to

change the membership of a committee appointed under this subsection, if the court determines

that the change is necessary to ensure adequate representation of creditors or equity security

holders."  Further, prior to the 2005 amendments, many courts utilized "§ 105(a) of the

27

Bankruptcy Code as a means of ensuring that the trustee has not acted arbitrarily or capriciously, or otherwise abused its discretion, in appointing the committee" *In re Barney's Inc.*, 197 B.R. at 439.

At the core of the instant dispute is the role of the unsecured creditors' committee as a representative body of all the unsecured creditors with claims against AGIS.  Yet, Qwest's arguments fail where they confuse the standing of the unsecured creditors' committee, with the standing of its individual members.  *In re National Sports Distributors, Inc.*, 227 B.R. 455, 464 (Bankr. E.D. Pa. 1998) ("A holder of a claim []who serves on a committee undertakes to act in a fiduciary capacity on behalf of the members of the class he represents.  After a creditor [] undertakes to serve in this fiduciary capacity, he is duty bound to represent the interests of all members of his class *and his rights and duties are of a different nature*.") (emphasis added). The distinction is dispositive, and by ignoring it Qwest overlooks the standing of the unsecured creditor constituency which endures and cures the purported procedural defect.  A creditors' committee is the representative body for the entire unsecured creditor constituency.  *In re ABC Automotive Products Corp.*, 210 B.R. 437, 441 (Bkrtcy E.D. Pa. 1997).  In this capacity the committee is responsible for representing and protecting the interest of the unsecured creditors in the plan negotiation process and throughout the entire bankruptcy case. *Id.* (citing H.R. Rep. No. 595, 95th Cong., 1st Sess. 235, 401 (1978)) ("creditors' committees will be 'the primary negotiating bodies for the formulation of a plan of reorganization,' will represent the class of creditors from which they are selected, will provide 'supervision of the debtor in possession and of the trustee, and will protect their constituents' interests.").  As such, it is evident that participation on the unsecured committee is accompanied and undergirded with fiduciary

28

responsibilities which obligate members to "act with undivided loyalty for the benefit of all of the unsecured creditors." *In re ABC Automotive Products Corp.*, 210 B.R. at 441.

AT&T as a member of the Official Committee of Unsecured Creditors of Apex Global, may, in its individual capacity, no longer has active claim against the debtor. However, this does not implicate the standing of the unsecured creditor constituency that the Committee represents. Although the claims of the Committee's original members may have been satisfied or mooted prior to the initiation of the adversary proceeding, the continued existence of the unsecured creditors' class is sufficient to maintain a justiciable controversy under Article III of the Constitution. *See Hadix v. Johnson*, 182 F.3d 400, 406 n.3 (6th Cir. 1997) (in the analogous class action context, "mootness of the original named plaintiffs' claims ... does not moot the class action, provided a live controversy remains between the defendants and the plaintiff classes."); *see also Shipp v. Memphis Area Office, Tennessee Dep't of Employment Sec.*, 581 F.2d 1167, 1171 (6th Cir.1978) ("When a district court certifies a class, the class of unnamed members acquires a legal status separate from the interests of the individual plaintiff."); *U.S. Parole Commission v. Geraghty*, 445 U.S. 388, 404, 100 S. Ct. 1202, 63 L. Ed. 2d 479 ("We therefore hold that an action brought on behalf of a class does not become moot upon expiration of the named plaintiff's substantive claim, even though class certification has been denied. The proposed representative retains a 'personal stake' in obtaining class certification sufficient to assure that Art. III values are not undermined.").

Beyond the Article III arguments, it appears that the terms of the confirmed plan bind the debtor and any creditor. 11 U.S.C. § 1141(a). Section 1127(b) is the sole means for modification of a confirmed plan which provides that the proponent of a plan or the reorganized

29

debtor may modify such plan at any time after confirmation of such plan and before substantial

consummation of the plan.  11 U.S.C. § 1127(b).  AT&T, along with the other eligible creditors,

were appointed to the unsecured creditors' committee by the U.S. Trustee on March 17, 2000,

and on that date became the representative of the Debtor's estate for purposes of initiating the

disputed adversary action.  The U.S. Trustee's actions were justified, deriving its authority from

Sections 1102 and 1103 in conjunction with the confirmed Plan of Reorganization, which

provides in part, "The Committee shall retain and may enforce any and all of the Debtor's

Claims in the name of the Debtor..." [Section 6.3 (c)].  The Plan was confirmed by the

Bankruptcy Court's Order of August 9, 2000, and from that point forward the Committee was

duly authorized to pursue the disputed adversary action.  Moreover, Section 6.3(a) permits the

U.S. trustee to appoint additional/successor Committee members.  Here, beyond the two cited

provisions, neither party has submitted a copy of the confirmed Plan.[9]  However, it is undisputed

that under the Plan the Committee had the authority to initiate the instant proceeding, and the

U.S. trustee to appoint additional members.

   Certainly the equitable underpinnings of Qwest's arguments are persuasive.  An

unsecured creditors' committee, no matter how protracted the litigation, should remain

composed of unsecured creditors.  It is perplexing that the unsecured creditors' committee at

issue had dwindled so low as to have but one remaining member whose status was, at a

minimum, questionable.  As such, the ideological apex of Qwest's arguments concern the

potential bias or conflict of interest that would inevitably proliferate if creditors with satisfied

---

[9] Citation to the Bankruptcy Docket is insufficient for inclusion into the appellate record, especially when the cited docket entries pre-date electronic filling.

claims remain on the unsecured creditors' committee.  However, these concerns, as demonstrated above, are alleviated by the preeminent fiduciary duty with which committee members are endowed.

<div align="center">2.    <u>Denial of Additional Discovery</u></div>

The second portion of the Cross-Appeal relates to Qwest's arguments regarding the Bankruptcy Court's denial of additional discovery as to the status of AT&T on the Committee at the commencement of the instant adversary proceedings.  Based on the foregoing analysis, this Court is unable to conclude that the Bankruptcy Court's decision "relied upon clearly erroneous findings of fact, improperly applied the governing law, or used an erroneous legal standard." *Elec. Workers Pension Trust Fund of Local Union #58, IBEW v. Gary's Elec. Serv. Co.*, 340 F.3d 373, 378 (6th Cir. 2003).

**V.     CONCLUSION**

Accordingly, the bankruptcy court's judgment is **AFFIRMED**.

<div style="margin-left:40%;">S/Denise Page Hood            <br>Denise Page Hood<br>United States District Judge</div>

Dated:  April 13, 2009

I hereby certify that a copy of the foregoing document was served upon counsel of record on April 13, 2009, by electronic and/or ordinary mail.

<div style="margin-left:40%;">S/William F. Lewis           <br>Case Manager</div>